Grafton
No. 87-429

NORTH BAY COUNCIL, INC., BOY SCOUTS OF AMERICA

v.

KARL T. BRUCKNER, ESQUIRE

April 7, 1989

*Gallagher, Callahan & Gartrell P.A.*, of Concord (*Steven J. McAuliffe* and *Anne L. Gannon* on the brief, and *Ms. Gannon* orally), for the plaintiff.

*Hamblett & Kerrigan P.A.*, of Nashua (*Joseph M. Kerrigan* on the brief and orally), for the defendant.

SOUTER, J. In this action for legal malpractice in failing to make adequate disclosure of a cloud on the title to real property, the plaintiff appeals a defendant's verdict rendered after jury trial in

the Superior Court (*Smith*, J.). Because a verdict should have been directed for the plaintiff on the issue of liability, we reverse and remand for a new trial on damages.

The title problem underlying this action was first brought to the court's notice in *North Bay Council, Inc. v. Grinnell*, 123 N.H. 321, 461 A.2d 114 (1983), upon which we rely in part for an understanding of facts and procedural history. In 1951, William Morse Cole conveyed a tract of some 1200 acres in Orford and Piermont to Kaiora Camp, Inc. The recorded deed from Cole to the camp contained this paragraph:

> "RESTRICTIONS: It is a condition of this conveyance that the Grantee herein and is (sic) successor shall not, for a period of TEN YEARS from the date of this deed, use the land and premises herein conveyed for any purpose other than agriculture, lumbering, and a SUMMER CAMP for children under secondary school age; and that any other Commercial Enterprise such as maintaining a Public House of entertainment and/or recreation, a Public Boat Livery or a Public Store, is excluded from the privileges (sic) under this conveyance; but the term Commercial Enterprise shall not be construed to include the building and rental or sale of a dwelling or dwellings for single-family use standing not less then (sic) two hundred feet from all other dwellings on said land; and further, the Grantee and its successors herein, shall not sell any part of the property herein conveyed until it shall have first offered it for purchase to the Grantor, his heirs or assigns, at the highest price at which they have received a Bona Fide Offer."

Cole died in 1961, and the following year Kaiora Camp agreed to sell the land for $125,000 to Bay Shore Council, Inc., Boy Scouts of America, the corporate predecessor in interest of the plaintiff, North Bay Council, Inc. (Bay Shore and North Bay have been treated as identical in this litigation, and for convenience we will refer to them without distinction as the plaintiff.) In anticipation of its purchase, the plaintiff acted through a Massachusetts lawyer associated with it as a director or trustee, Charles Demakis, who hired the defendant, Karl T. Bruckner, Esq., to provide an abstract of title and an opinion about its quality. The title examination disclosed Cole's restrictions set out above, but it revealed no indication that the property had been released from the restrictions, or that the restrictions had been waived by those entitled to their

benefit, or that the obligation imposed by the right of first refusal had been satisfied by Kaiora Camp.

Because time was short, the defendant gave no written opinion prior to the closing, but he did communicate with Demakis over the telephone. The defendant testified that he apprised Demakis of the language creating the right of first refusal for the benefit of Cole, his heirs and assigns, and gave his opinion that the resulting restriction had expired by its own terms ten years after the date of Cole's deed. The plaintiff proceeded to accept conveyance of the land and thereafter received the title abstract certified by the defendant, which quoted the paragraph of restrictions in Cole's deed, together with the defendant's written opinion that the plaintiff then had "good" title to the tract, subject to several listed encumbrances not relevant here, but without mention of the first refusal.

Although Kaiora Camp paid no heed to Cole's restrictions when it conveyed the land to the plaintiff, the first refusal right attracted attention in 1979, when the plaintiff was negotiating a sale of the major part of the property to Webville Enterprises, Inc. (erroneously spoken of as "Melville Enterprises, Inc.," in *North Bay Council, Inc. v. Grinnell*, 123 N.H. at 323, 461 A.2d at 115). Webville's lawyer discovered the first refusal provision, which he viewed as creating a cloud on the plaintiff's title, and soon thereafter Cole's heirs, his two daughters, learned about it. The heirs declined at that time to purchase the tract, but after the plaintiff had begun action to quiet the title in *North Bay Council, Inc. v. Grinnell, supra*, they claimed the right to purchase at the price the plaintiff had paid in 1962. *North Bay Council, Inc. v. Grinnell*, 123 N.H. at 323, 461 A.2d at 115.

In that earlier action, the superior court construed the first refusal right as enduring beyond ten years from the date of Cole's deed, but subject to the rule against perpetuities, so as to limit its enforceability to twenty-one years from Cole's death in 1961. *North Bay Council, Inc. v. Grinnell, supra* at 324, 461 A.2d at 116. The heirs nevertheless lost their bid to enforce the right at the 1962 price when the court found them chargeable with laches in asserting their claim, *North Bay Council, Inc. v. Grinnell*, 123 N.H. at 325, 461 A.2d at 117, and the appeal to this court was ostensibly limited to the application of the rule against prepetuities and the doctrine of laches, *id.* at 324, 461 A.2d at 116. Our affirmance of the superior court's judgment left the plaintiff in a position to sell the property and to begin this malpractice or negligence action against the defendant.

The plaintiff's declaration faults the defendant, not in examining the title or in abstracting the record, but in advising that the title was good, subject only to the exceptions not relevant here. The nub of the claim is negligence in failing to advise that the language creating the first refusal right constituted an objectionable cloud on Kaiora Camp's title. As a consequence of its reliance on the title opinion, the plaintiff is said ultimately to have incurred damages resulting from delay in disposing of the property until the title could be cleared through the prior litigation. The case was tried to a jury, which returned a verdict for the defendant. Although a number of issues are raised in this appeal, we will go directly to the assignment of trial court error in denying the plaintiff's motion to direct a verdict on the issue of liability.

 A plaintiff is entitled to a directed verdict on liability only if no rational trier of fact viewing the evidence most favorably to the defendant could fail to find on undisputed facts that each element of liability has been proven, see *Williams v. Duston*, 79 N.H. 490, 491, 111 A. 690, 691 (1920); R. WIEBUSCH, 5 NEW HAMPSHIRE PRACTICE, CIVIL, PRACTICE AND PROCEDURE § 1581, at 295, § 1585, at 297 (1984); *Morrill v. Tilney*, 128 N.H. 773, 777, 519 A.2d 293, 295 (1986). Conversely, such a conclusion is barred when evidence on the existence of any such element is conflicting, *see id.* at 778, 519 A.2d at 295, or when an issue exists about the credibility of a witness necessary to establish an element, *compare* 5A MOORE'S FEDERAL PRACTICE 50.02[1], at 50-31–50-32 (error to direct verdict for party with burden of proof when case totally dependent on credibility of witnesses) *with* 9 WRIGHT AND MILLER, FEDERAL PRACTICE AND PROCEDURE § 2535, at 590–92 (verdict may be directed for party with burden of proof if reasonable minds could not disbelieve testimony sufficient to support verdict). The elements of liability in a legal malpractice action to which this rule may be applied require demonstration of a relationship, as of client and attorney, upon the latter of whom the law imposes a duty to exercise care, skill and knowledge in providing legal services to the client; a breach of that duty; and a connection of legally recognized causation between the breach and resulting harm to the client. *See Marks Polarized Corp. v. Salinger & Gordon*, 476 N.Y.S.2d 743, 744 (Sup. Ct. 1984); MALLEN AND LEVIT, LEGAL MALPRACTICE 804 (2d ed. 1981). The malpractice plaintiff's burden in proving liability is thus essentially the same as any negligence plaintiff's burden to prove facts upon which the law imposes a duty of care, breach of that duty, and so-called proximate causation of harm. *See Rounds v. Standex International*, 131 N.H. 71, 76, 550 A.2d 98, 101 (1988).

The evidentiary record on each such element in this case was sufficiently exceptional to warrant the direction of a liability verdict. The admitted scope of the professional relationship obliged the defendant as a matter of law to advise about the risks of title defects, as such defects were understood at all times relevant to this litigation. As the court was bound to construe the 1957 restrictions, their meaning was such that no reasonable jury could have failed to find on the uncontradicted evidence that they raised a cloud on title requiring advice that the defendant admittedly failed to provide. Since the defendant also admitted that the plaintiff was entitled to rely on the content of his opinion and did so, and since the undisputed harm suffered by the defendant was within the risk created by the title defect, the jury was bound to find the remaining element of causation, sufficient to establish liability.

That the defendant undertook to act as attorney for the plaintiff was undisputed. Although the defendant testified to some initial uncertainty about his relationship to Demakis and the Boy Scout organization for which Demakis was speaking, he agreed that when the time came to give legal advice about the state of the property title he understood that he was advising the plaintiff as a client, and it was to the plaintiff, not Demakis, that he addressed the written title opinion reflecting his prior oral advice. The defendant's further testimony indicates that there was no dispute about the nature of the legal services he had been hired to provide. Initially, Demakis had requested a title search and abstract of records, but the defendant testified that the assignment was subsequently expanded to include an opinion on the state of the title. Thus, no jury determination was needed to establish the existence of an attorney-client relationship calling for the defendant to advise the plaintiff about the condition of Kaiora Camp's title to the property in question, and no rational jury could have found that the plaintiff had failed to prove this element.

■ Given the existence of an attorney-client relationship, the law imposes a duty on the lawyer, *see Guilarini v. Company*, 98 N.H. 118, 119, 95 A.2d 784, 785 (1953) (relation of parties determines whether law imposes duty on one for benefit of the other), to exercise reasonable care and ordinary skill and knowledge in providing the legal services agreed upon. *See McLaughlin v. Sullivan*, 123 N.H. 335, 340, 461 A.2d 123, 126 (1983). As we shall see further on, this case presents no dispute about the proper geographical and temporal reference points for identifying what was reasonable and ordinary within the legal profession. It is necessary, however, to articulate the defendant's

duty with particular reference to advice about the title to the real estate in question, in order to understand the exact nature of the breach that must be proved.

■ The obligation of the lawyer giving an opinion on title to real estate reflects the normal concern of a client intending to buy land, who, in the absence of a different agreement with an intending seller, seeks ideally to acquire property free from third-party interests. Given the fact that no transaction in life can promise entire certainty of consequences, the buyer's actual objective is to limit the risk of harm from third-party claims to some practically achievable minimum. A land title carrying a risk acceptably low has commonly been described as "good," *Little v. Paddleford*, 13 N.H. 167, 174 (1842), or by the synonymous term, "marketable," *Paradis v. Bancroft*, 97 N.H. 477, 479, 91 A.2d 925, 926 (1952), adjectives traditionally employed in the exercise of equity jurisdiction to describe a title that equity would compel a buyer to accept in a suit for specific performance of a land sale contract. IV AMERICAN LAW OF PROPERTY § 18.7 (1952). Since the decision in *Paradis v. Bancroft supra*, we have described a marketable title as one that is "free from reasonable doubt in law or in fact; not merely a title valid in fact but one which can be readily sold to a reasonably prudent purchaser or mortgaged to a person of reasonable prudence[,] . . . a title . . . free from any reasonable objection of a reasonable purchaser." *Paradis, supra* at 479, 91 A.2d at 926 (citations omitted); *see, e.g., Buxton v. Glennon*, 122 N.H. 674, 676, 448 A.2d 420, 421 (1982).

■ Accordingly, a lawyer evaluating title to real property for an intending buyer is bound by the standard of professional due care to disclose and explain the significance of any feature of the title, subject to discovery within the requisite scope of the lawyer's title examination, that would lead a reasonably prudent purchaser to refuse to take conveyance of the property, at least when paying full value for it. IV AMERICAN LAW OF PROPERTY *supra*. Under the standard of the prudent purchaser, features subject to such disclosure and advice include not only actual defects and encumbrances, but any apparent defects and encumbrances subject to reasonable objection as creating risks of adverse claims or losses that the prudent buyer would refuse to run, which are thus spoken of as clouds on the title. *See Dowd v. Gagnon*, 104 N.H. 360, 363, 187 A.2d 63, 65 (1962).

As the second element of its case on liability, therefore, the plaintiff had to demonstrate that a reasonably prudent buyer in 1962 would not have paid full value for property with a record title that included Cole's 1951 first refusal provision, in the absence of any indication of record that its terms had been released, waived or satisified, and that the defendant failed to explain that, on the state of the entire record, the terms of the 1951 deed thus rendered the title unmarketable. The plaintiff had the burden, that is to say, to demonstrate the significance of the preemptive 1951 deed language; its inconsistency, standing alone, with marketability of title in 1962; and the defendant's failure to give adequate advice to this effect.

 The first step in thus establishing breach of duty, to demonstrate the significance of Cole's restriction, presented a matter to be resolved by the court, under the rule that interpretation of the terms of a deed is an issue of law. *Baker v. McCarthy*, 122 N.H. 171, 174–75, 443 A.2d 138, 140 (1982). The trial court committed error, however, not only by leaving it to the jurors to place the final construction on Cole's language, but also by charging them that the specific issue of interpretation was whether the right of first refusal created in 1951 was enforceable at the time of Kaiora Camp's conveyance to the plaintiffs. As we have seen, a cloud is sufficient to render title unmarketable, and a cloud is defined by reference, not to the ultimate enforceability of a third party's demand, but to the reasonableness of a buyer's objection to a potential third-party claim. *Buxton v. Glennon*, 122 N.H. at 676, 448 A.2d at 421. Thus, the appropriate question was not whether Cole's heirs could have enforced the right of first refusal in 1962, but whether Cole's language, considered in light of the entire record title, raised a reasonable question about the plaintiff's ability to convey free of preemptive third-party rights. Another way to phrase the appropriate question would have been to ask whether the first refusal provision could reasonably be read to provide a colorable basis for a third-party claim that, if pressed, would cause damage to the buyer, whatever its ultimate resolution might be.

When the question about the meaning of the 1951 language is posed this way, the deed restriction does not present a difficult problem of interpretation. The paragraph headed "Restrictions" contains four clauses separated by semi-colons. The terms of the first restrict the uses of the land to agriculture, lumbering and a children's summer camp, for a period ten years from the date of the deed. The second and third clauses forbid any other commercial uses of the land except as sites for single-family houses at least two

hundred feet apart. The fourth clause creates the right of first refusal. The plaintiff argues that if the ten-year limitation contained in the first clause also applied to the second and third, the latter two would be redundant, since there would be no need to forbid a commercial use such as running a public house if the only permissible uses were agriculture, lumbering and camping for children. On this reasoning, therefore, the ten-year limitation applies to the first clause in which it is contained, but not to the second or third, with the result that the land was open to commercial residential development after ten years. Finally, if there is thus good reason to infer that the time limitation has no application to the second and third clauses, then the contextual basis to hold the limitation applicable to the fourth clause creating the right of the first refusal must at best be doubtful. (And the doubt would not disappear even upon realizing that Cole's wife joined in his deed in order to give Kaiora Camp a ten-year right of first refusal over certain other land that she owned.)

What is significant is not whether this analysis would ultimately have been held to be right or wrong (even though it is consistent with the results reached by the superior court when it construed the fourth clause in the earlier litigation). What is important is that the analysis rests on a textual basis placing it within the realm of reasonable argument that there was no express limit of time within which Cole or his heirs were entitled to first refusal.

The capacity of the language to bear this meaning must be assumed, therefore, in proceeding to the second step in determining breach of duty, that of determining whether the restriction rendered the camp's title clouded and unmarketable when judged in light of the whole record, which in this case was devoid of any indication that those who might be entitled to exercise a first refusal right eleven years after its creation had been afforded that opportunity, or had effectively waived it, or had terminated their right to do so. Although this latter question was one of fact, it would have been error to submit it to the jury in this case. A gambler might have bought from the camp under these circumstances, but the evidence indicated that no prudent purchaser would have done so, let alone for full value, subject to the risk that sometime in the future Cole or his heirs could demand conveyance of the property to them at the price paid by the plaintiff to the camp. No contrary opinion was presented to the jurors, who could not reasonably have found otherwise.

The third step in considering breach of duty is to inquire whether the defendant did whatever was reasonably necessary to apprise the plaintiff of the title's unmarketability, and on this question we perceive no conflict in evidence for the jury to resolve. The title opinion rendered after the closing and supposedly confirming the defendant's prior advice made no reference whatever to the provision in question or to the absence of any recorded indication of release, waiver or compliance, or to the risk of at least a colorable third-party claim inherent in this state of the title. Moreover, the defendant's own account of his conversation with Demakis before the closing indicates that at best he mentioned the 1951 language and advised that the period of its enforceability had expired. No one could have found that he had advised of the risk created by the provision.

Here it is well to pause for a moment to consider the focus of the defendant's evidence in the case, and to explain why it raised no conflicts within the relevant evidentiary record to which we have referred thus far. The defendant and his expert conceded that due care required a buyer's title attorney to advise his client about the effect of language in title documents creating either an encumbrance, such as a clear right of first refusal, or a cloud, representing a reasonable doubt about the ability of the seller to convey free of such a third-party right, thus supporting a reasonable objection to taking title. The plaintiff's evidence was, of course, to the same effect, that a lawyer in such a position was obligated to disclose and advise the client about any encumbrance or cloud created by instruments in the chain of title.

Although both the defendant and his expert witness testified that the defendant had no duty to advise the plaintiff that Cole's first refusal language created the risk of a third-party claim, their opinions were premised on their conclusions that the right of first refusal had expired by its own terms prior to 1962 and that Cole's language could not reasonably be read otherwise. That is, their opinions were simply that the defendant had no duty in 1962 to advise about the effect of a deed provision that was then ineffective to create either an encumbrance or a cloud.

The defense presented no testimony, however, denying that there would be a cloud on the title in 1962 by virtue of language giving rise to a reasonable question about the enforceability of a first refusal claim at that time, and no testimony suggesting that such a cloud would somehow fall outside the subject of the lawyer's duty to disclose and advise of risks. The plaintiff, to the contrary, presented expert evidence that, at the least, Cole's language created

such a cloud and that the defendant was obliged to advise the plaintiff about its potential consequences.

Had it been up to the jury to decide whether Cole's language actually gave rise to a reasonable claim of a right of first refusal in 1962, there would thus have been conflicting evidence requiring submission of the issue to the trier of fact. As we have seen, this was the trial court's actual view of the issue, which it did submit to the jury. But, as we have also seen, the issue of whether Cole's language could be construed to support at least a reasonable claim of enforceability in 1962 should have been resolved by the court, and resolved in the plaintiff's favor. As a consequence, the trier of fact was required to assume that the language supported a reasonable argument for the existence of a first refusal right in 1962. Because the defense offered no evidence that language susceptible to such interpretation did not create a cloud subject to a title attorney's professional duty to advise of risks, there was no evidence to counter the testimony of the plaintiff's expert, that Cole's language as so construed created a cloud requiring specific disclosure and advice in the title opinion.

█ The remaining element of liability required proof that the failure to give adequate advice was a cause of the litigation and delay that the plaintiff claims as the source of monetary damages. As expressed in terms of general principles governing legal causation, the failure to advise must have been necessary to produce the plaintiff's subsequent harm, without which the harm would not have occurred, and the failure must have been a substantial factor, rather than a slight one, in producing it. See Pillsbury-Flood v. Portsmouth Hosp., 128 N.H. 299, 304, 512 A.2d 1126, 1129 (1986); see RESTATEMENT (SECOND) OF TORTS § 431 comment a, at 429, § 432(1), at 430; see also § 430 comment e, at 428. Because the object of hiring a title attorney to advise about risks inherent in the title is to enable a buyer to act prudently either in declining to take title subject to those risks, or at least in assessing the risks intelligently if the buyer should decide to take title anyway, proof of the causal link between negligent title advice and subsequent damage required evidence of the buyer's reliance upon the advice. MALLEN AND LEVIT, LEGAL MALPRACTICE 762; see Eckert v. Schaal, 251 Cal. App. 2d 1, 5, 58 Cal. Rptr. 817, 819–20 (Ct. App. 1967). But see Ishmael v. Millington, 241 Cal. App. 2d 520, 529, 50 Cal. Rptr. 592, 597–98 (Ct. App. 1966) (reliance, confused with sole reliance, held to be unnecessary). It is therefore through the medium of the plaintiff's reliance that the negligent advice must be shown to have

been a substantial factor in the plaintiff's subjection to the undisclosed risk that later materialized.

In this case, the burden to prove reliance is not subject to complication by claims of comparative or contributory negligence, and there is no evidence that the damages flowed from any title defect other than the cloud that the defendant failed to identify as such. Hence it is fair to say here that causation may be established by proof that the plaintiff completed the purchase in sole reliance on the defendant's opinion that the title was free from the cloud under consideration, and that the subsequent delay and litigation were within the risk of harm that the defendant's opinion failed to disclose. On neither point was there any evidence on which the jury could reasonably have found in the defendant's favor.

Demakis testified in a deposition entered in evidence that he did not give and would not have given the plaintiff an opinion on the marketability of a New Hampshire title subject to New Hampshire law, and the defendant testified that Demakis asked him to give an opinion directed to the plaintiff prior to the closing, following which the plaintiff paid the price and accepted the deed conveying such title as Kaiora Camp had to the property in question. The advice was confirmed by a later written opinion that the plaintiff's title was good, subject to encumbrances not in issue here. There was no evidence on which the jury could have found that the plaintiff failed to rely on the advice that the defendant gave, or that the plaintiff assigned little weight to the advice, or would have purchased even if the cloud had been disclosed. Indeed, the defendant himself conceded that the plaintiff had a right to rely on his opinion and completed the transaction in reliance on his undertaking to forward the written statement of his opinion after the closing.

Nor was there any evidence contesting the facts that the plaintiff's sale of the property was delayed until the conclusion of the prior litigation, or that the litigation and delay proceeded from the risk indicated by the cloud in question. As we observed before, the risk was that the individuals arguably entitled to exercise the right of first refusal in 1962 would claim that they had not received the offer to which they had been entitled and would demand the conveyance that they could then have obtained, or its economic equivalent. That, of course, is exactly what Cole's heirs subsequently demanded and would have received, but for the successful defense of laches sustained by this court in the prior appeal. No reasonable juror could have reached any other conclusion.

In sum, considering all of the evidence most favorably to the defendant, no reasonable trier of fact could have failed to find the plaintiff entitled to a verdict on the issue of liability, and the motion for directed verdict should have been granted. We remand for a new trial on the issue of damages.

*Reversed and remanded.*

JOHNSON, J., did not sit; the others concurred.